## MORTON v. CITY OF NEVADA.

*(Circuit Court, W. D. Missouri, W. D.   March 3, 1890.)*

1. MUNICIPAL CORPORATIONS—VOID BONDS—IMPLIED PROMISE.
   Bonds of a city being void because issued under an act violating Const. Mo. 1865, art. 11, § 14, declaring that the general assembly shall not authorize any city to loan its credit to any corporation unless two-thirds of the qualified voters assent thereto, the purchaser cannot maintain an action for money had and received to recover the amount paid to the city for such bonds, as, the city having no power to create the debt, no implied promise can arise for its payment, notwithstanding Gen.

St. Mo. 1865, c. 41, § 7, gives the board of trustees power "to borrow money for the improvement" of the town, the money having been borrowed in violation of the constitution, and not for the improvement of the town, but to buy a right of way and depot grounds for a railroad.

2. SAME—LIMITATION OF ACTION—RUNNING OF THE STATUTE.

An action upon an implied promise by a city to repay money received for void municipal bonds accrues at the time the payment is made, and not from the time the bonds are adjudged void, or from the discovery of his mistake by plaintiff. in the absence of fraudulent concealment by defendant, or from the time of demand.

3. SAME.

Though illegal bonds of a city be regarded as voidable only at the will of the city, an action as for money had and received is barred by Rev. St. Mo. § 3980, limiting actions on implied promises to five years, where, more than five years before action brought, the city refused to pay interest thereon, and pleaded in an action thereon that they were void, though it was stipulated in that action that the suit might be continued till decision in another suit involving the validity of similar bonds, as on the plea of *ultra vires* plaintiff could abandon his suit, and sue on the implied promise.

At Law.   Action for money had and received.

*J. B. Henderson* and *J. M. Lewis*, for plaintiff.

*Burton & Wight*, for defendant.

PHILIPS, J.   This is an action for money had and received, and grows out of the following state of facts, substantially, presented on an agreed statement:   The defendant is an incorporated town, under the General Statutes of the state.   In 1870 the Tebo & Neosho Railroad Company was constructing a railroad in the direction of the defendant town.   To secure the location of a depot within one-half mile of the public square, the board of trustees agreed with said company to donate 10 acres of ground for such depot purposes.   To this end said trustees passed a resolution to procure and donate to the company the right of way through said town, and to pay a sum not exceeding $5,000 for the actual cost to the company of establishing such depot; also, to donate for depot and other purposes 10 acres of ground.   Thereafter, on June 4, 1870, under an act of the general assembly of the state entitled "An act to authorize cities and towns to purchase land, and to donate, lease, or sell the same to railroad companies," approved March 18, 1870, the said board of trustees ordered an election of the qualified voters of the town, to be held October 25, 1870, to vote for the issue of $10,000 in bonds of said town, with which to purchase the ground for said railroad company.   At such election a majority of those voting at said election voted for the issue of such bonds.   On November 1, 1870, the chairman and the clerk of said board of trustees executed in due form 20 bonds of $500 each, payable at the national bank in the city of New York, ten years after date, payable to the Tebo & Neosho Railroad Company or bearer, with interest at the rate of 10 per cent. per annum, payable semi-annually at said bank, with the usual interest coupons attached thereto.   That said bonds, through defendant's financial agent, were placed upon the market, and were bought by the plaintiff, who paid therefor $8,171.   With this money the defendant bought 10 acres of ground, paying therefor the sum of.$6,785.50, taking the deed for said land to the incorporated town of Nevada.   The balance of said money was used by said board of trustees for various purposes incident

to the government of said town. The Tebo & Neosho Railroad Company thereafter, having sold and conveyed to, and merged its line of railroad and property, franchises, etc., into, the Missouri, Kansas & Texas Railroad Company, the defendant duly conveyed said 10 acres of ground to the last-named company. On the 23d of August, 1877, the plaintiff instituted suit against defendant in the United States circuit court for the western district of Missouri, at Jefferson City, to recover upon the past-due coupons attached to said bonds. On the 20th day of November, 1877, the defendant answered to said action, in which it pleaded that it was not liable in said action, for the reason that the act of March 18, 1870, under which the bonds and coupons in question were voted, was unconstitutional. To this answer the plaintiff filed a demurrer on the 22d day of November, 1877, which demurrer was submitted to the court. At that time there was pending in the supreme court of the United States, on appeal from said circuit court, the case of *Jarrolt* v. *Moberly*, in which the same question, to-wit, the constitutionality of the act of March 18, 1870, was involved, which case is reported in 103 U. S. 586. The attorneys in said case of *Morton* against *The Town of Nevada* then agreed that no further action was to be taken therein, but the case would stand upon the pleadings therein until the supreme court passed upon said *Jarrolt Case*, after which either party might proceed in said cause as might be deemed best by said party, and the cause was continued. On the 25th day of November, 1881, after the supreme court had decided in said *Jarrolt Case* that the said act of March 18, 1870, was unconstitutional, said cause of *Morton* v. *Town of Nevada* was taken up, and the demurrer therein overruled, and judgment entered for defendant. The interest on said bonds was paid by the town of Nevada for the years 1871 and 1872, after which the town refused to pay plaintiff any further interest, for the reason that said bonds and coupons were unconstitutional, and issued without authority. October 29, 1885, the plaintiff instituted this action, setting up substantially the history of facts aforesaid, and asking judgment against the defendant for the amount of money so paid by plaintiff for said bonds, with interest thereon.

Two principal questions arise on the foregoing facts: Will the action for money had and received lie against the defendant? And, if so, is the cause of action barred by the statute of limitations?

Bonds similar to these were held by the supreme court in *Jarrolt* v. *Moberly*, *supra*, to be void, for the reason that their issue was in contravention of section 14, art. 11, of the state constitution of 1865, which declares that—

"The general assembly shall not authorize any county, city, or town to become a stockholder in, or to loan its credit to, any company, association, or corporation, unless two-thirds of the qualified voters of such county, city, or town, at a regular or special election to be held therein, shall assent thereto."

This provision was prohibitory in its character. In its legal effect, it was a withdrawal from and a denial of the power to such constituent

bodies to loan their credit to such corporation, unless authorized thereto by the vote of two-thirds of the qualified electors. No such vote having been taken, and no consent of the qualified voters given, the power to create this debt never came into existence. It would therefore seem to follow logically that, no matter what the form of action is, no recovery could be had against the town, as such, for the money arising from the sale of the bonds, as the town was forbidden by law from doing what it did do. We are not left in this controversy to conjecture to ascertain what was the object and scope of the provision of the constitution in question. The supreme court of the state of Missouri, speaking through NAPTON, J., in *State* v. *University*, 57 Mo. 183, say:

"What was the object of restriction on county courts, city and town municipalities? The object was, plainly, to prevent them from taxing the people without their consent. * * * It is manifestly the intention of the constitution to prevent taxation without the assent of the tax-payers, and without regard to the purposes of the proposed tax."

So Mr. Justice FIELD, speaking for the supreme court of the United States in *Jarrolt* v. *Moberly, supra*, says:

"The object of the inhibition in the state constitution was to prevent the creation of debts by counties, cities, and towns on behalf of any company, association, or corporation, without the assent of two-thirds of their qualified voters."

After referring to the abuses which had hitherto grown up in the state in this respect, he further says:

"It was the purpose of the constitutional provision to check these abuses, by requiring the previous assent of two-thirds of the qualified voters of the municipal bodies before any more stock should be subscribed by them, or any further indebtedness be thus incurred."

Further on he says:

"As remarked by counsel, it is difficult to see how the fundamental law of the state could be evaded by a change of the parties through whom the credit of the municipality is to be converted into money. In either case, the debt created is to be paid by taxation."

What is said by Chief Justice BEASLEY in *Town of Hackettstown* v. *Swackhamer*, 37 N. J. Law, 191, is quite pertinent and reasonable:

"Nor do I think that it adds anything to the right to enforce the note in this case that the money which it represents, and which was borrowed, has been expended in behalf of the corporation for legitimate purposes. The argument on this head was that, as the money had gone for the benefit of the corporation, the law, upon general principles, would compel its repayment. If this is so, then the rejection of an implied power to borrow is of little avail. The doctrine, although repudiated in the abstract, would be ratified in the concrete. If this contention is tenable, it is impossible to close the eye to the fact that the loan, although held illegal and void in its inception, would thus, by a subsequent act, be rendered valid and enforceable. To style it, as was done in the argument, 'money had and received,' would not change the real nature of the transaction. To permit a recovery of it in this secondary form would be, virtually and in truth, to effectuate a loan, and all the evils attendant on the power to borrow money in an unrestricted form would supervene. And it is to be noted that it is altogether a fallacy to argue that the law will

raise an implied promise to repay the money after it has been used. The impediment to such a theory is that the corporation has not the competency to make the promise thus sought to be implied. An express promise to the effect contended for would be illegal; and therefore, clearly, the law will not create one by implication. It is not the case of a principal using money borrowed by his agent without authority, but it is the case of a principal who is incapacitated by law from borrowing, and who therefore cannot legalize the act, either directly or by circuity. Perhaps a parallel instance would be presented in case of a loan to a married woman at common law; the money being used by her. Her promise to repay the loan would be void, and from the fact of her having made use of the money no implied promise in law could be deduced."

If the principle of an implied promise to pay is applicable to this case, how is the constitutional inhibition to be made effectual? Its object being, as declared by the expounders, both state and federal, of this constitution, to prevent taxing the people without their consent first had thereto, how can it be reached, if this suitor prevails? The result to the tax-payer is the same, whether he be taxed on the expressed contract in the bond, or on a contract arising by implication. What substance is there in the constitutional bulwark of protection, if its barriers are to be removed when the purchaser of the forbidden claim comes in the form of a suitor for money had and received, rather than in the action of *indebitatus assumpsit?* It is the cause of action, rather than the form of action, which determines the right. In either case, the constituent is taxed to pay the judgment. Such a distinction would sacrifice substance to form, and its practical result, inevitably, would be a nullification of the constitution. What the law forbids municipal bodies to do directly should not be permitted by indirect methods.

I am unable to perceive any difference in principle between this case and that of *Litchfield* v. *Ballou*, 114 U. S. 190, 5 Sup. Ct. Rep. 820. There the town authorities issued bonds to the amount of $50,000, to aid in the construction of water-works for the city. The supreme court of the United States in *Buchanan* v. *Litchfield*, 102 U. S. 278, held that the bonds so issued were void, on the ground that they were in violation of section 12, art. 9, of the state constitution, which declared that—

"No county, city, township, school-district, or other municipal corporation shall be allowed to become indebted, in any manner or for any purpose, to an amount, including existing indebtedness, in the aggregate exceeding five per centum on the value of the taxable property therein, to be ascertained by the last assessment for state and county taxes, previous to the incurring of such indebtedness."

After this judicial determination, one Ballou, who held some of the bonds, brought his action in equity, setting forth the history of their issue, and the adverse decision of the supreme court aforesaid. It was alleged that the proceeds of the bonds were taken and applied by the defendant town to the construction of said water-works, which works the defendant held, used, and enjoyed. Counsel for complainant therein conceded that an action at law for money had and received would not lie, but proceeded upon the theory that, as defendant had put the money received into the construction of the water-works, it should, in conscience,

restore what it thus had obtained; and a lien was prayed to be declared on the water-works, and enforced by the sale thereof, to satisfy complainant's claim. Mr. Justice MILLER, who delivered the opinion of the court, held that, as the constitutional provision forbade the creation of a debt in excess of the prescribed limit, no action would lie therefor in any form; that "there is no more reason for a recovery on the implied contract to repay the money than on the express contract found in the bonds." And further on he says:

"If this prohibition is worth anything, it is as effectual against the implied as the express promise, and is as binding in a court of chancery as a court of law."

It is true that stress is placed on the language of the constitutional provision that no city "shall be allowed to become indebted, in any manner or for any purpose, to an amount  *  *  *  exceeding five per centum." But what difference in principle can be maintained, in this particular, between that and the provision of the Missouri constitution? Both were designed to protect the tax-payers; in the language of Justice MILLER, "as an impassable obstacle to the creation of any further debt." The one affixed the condition that, while the city might incur debts up to a given point, yet beyond that it should not become indebted. The other declared that the general assembly of the state should not authorize any city, etc., to loan its credit to any corporation, etc., for any purpose, without the precedent act of the expressed consent of two-thirds of the qualified voters. Unless the debt contracted in the one instance is within the maximum limit, it cannot be enforced. In the other, the power is taken away to create it, unless the tax-payers first authorized it. "It was the purpose," says Mr. Justice FIELD, in *Jarrolt* v. *Moberly, supra*, "of the constitutional provision, to check these abuses, by requiring the previous assent of two-thirds of the qualified voters of municipal bodies before any more stock should be subscribed by them, or any further indebtedness be thus incurred.  *  *  *  A constitutional provision should not be construed so as to defeat its evident purpose, but rather so as to give it effectual operation, and suppress the mischief at which it was aimed."

Counsel for plaintiff suggest that an entire want of power does not appear in this case, because the General Statutes (1865) of the state (section 7, c. 41) declares that "such board of trustees shall have power to pass by-laws and ordinances  *  *  *  to borrow money for the improvement of such town, or to supply the same with water." It might be sufficient to say that, on the very face of the transaction, this money was not borrowed for any such purpose. The object for which this money was obtained does not come within the most liberal construction of the term "for the improvement of such town." The resort to the legislative expedient in the act of March 18, 1870, was a confession by its promoters, and a recognition by the legislature, of the fact that this statute of 1865 would not subserve the end sought to be accomplished by this subscription. But a more complete answer to this suggestion is that the constitutional provision under review interposed and prohibited this city from doing this very act. Reference is made to the cases of *Wood*

v. *Louisiana*, and *Gause* v. *Clarksville*, reported in 5 Dill. 122 and 165. It will be found there, as in other cases where the doctrine of implied promises has been applied, that the power to create the debt in the first instance existed. The opinion of TREAT, J., in *Wood* v. *Louisiana, supra*, 124, recognizes the distinction, that the "doctrine of *ultra vires*" would apply in the instance of an unlawful or prohibited act. And the opinion of Chief Justice WAITE in the same case on appeal, 102 U. S. 298, expressly states, as the foundation of the ruling, that "the city could lawfully borrow. The objection goes only to the way it was done."

*Statute of Limitations.* It must be conceded that there is an apparent equity in favor of plaintiff as to the sum of $1,385.50, which was used by the board of trustees "for various purposes incident to the government of said town." Whether these purposes were legitimate or not is not stated. But, assuming that they were, and conceding that the constitutional inhibition against creating debts after this fashion can be suspended as to so much of the loan as was carried into the city treasury, and used promiscuously with other funds of the city, the plaintiff is still confronted with the bar of the statute of limitations. Section 3228, Rev. St. Mo., 1879, declares that "civil actions, other than those for the recovery of real property, can only be commenced within the periods prescribed in the following sections, after the causes of action shall have accrued." Section 3230 prescribed the limit of five years in actions on implied contracts. When did this alleged cause of action accrue? WAGNER, J., in *Tapley* v. *McPike*, 50 Mo. 591, very succinctly states the rule thus:

"The general doctrine as to the statute of limitations is that the cause of action or suit arises when and as soon as the party has a right to apply to the proper tribunal for redress."

So CAMPBELL, J., in *Palmer* v. *Palmer*, 36 Mich. 488–494, said:

"A cause of action accrues for the purpose of setting the statute in motion as soon as the creditor by his own act, and in spite of the debtor, can make the demand payable."

In this technical view of the rule, a cause of action accrued to the plaintiff at the time defendant received plaintiff's money. The bonds were null and void *ab initio*. They never had any legal existence, and therefore were as if never written nor executed. When the plaintiff parted with his money therefor, he got nothing, and the equity invoked by him for restoration arose *eo instanti*. *Lunt* v. *Wrenn*, 113 Ill. 168, was the case of the issue and sale of fraudulent or forged land-scrip. In an action to recover back the money, the court, through Chief Justice SCHOLFIELD, said:

"If the right to recover is upon the ground of failure of consideration, it is quite evident that the statute of limitations is a complete defense, since, in that event, it began to run from the date of the transaction, for the condition of the scrip was then precisely what it is now,—counterfeit and worthless: and the evidence discloses no circumstance whereby, in any contingency, legitimate profit could be derived from its possession, either then or prospectively. And, if we shall concede that the liability to recover is upon the ground of an implied warranty of genuineness, we think it is equally clear that the statute of limitations, on the facts admitted in this record, is a complete de-

fense. The implied warranty, if it existed, was broken *eo instanti* it was made. *Blethen* v. *Lovering*, 58 Me. 437. The scrip was then counterfeit, and a nullity. There was nothing of title or value that passed by the change of its possession, and no future contingency could possibly affect its legal character."

If the action be bottomed upon the payment of money under a mistake, the cause of action accrued upon the payment of the money, and not from the date of the ascertainment of the fact of such mistake, in the absence of any fraudulent concealment on the part of the defendant. *Jones* v. *School-Dist.*, 26 Kan. 490. That was the case of a county treasurer overpaying a school-district, and suing to recover it back. BREWER, J., *inter alia*, said:

"Now, whatever right of action plaintiff has under such circumstances springs not from any express promise in writing, but arises from the implied duty of the defendant to pay to any one moneys which through mistake it had received from such person. The obligation is not founded upon a written contract, but springs from an implied obligation to return moneys it has improperly received. But such a cause of action is barred by the statute of limitations at the end of three years  *  *  *  from the time of the payment to the district."

It was insisted in that case that the treasurer ought not to be held to have instituted his suit until after he had a settlement with the court, on which the court further observed:

"A settlement with the commissioners may be of value in ascertaining the amount of the overpayment, but it does not make the fact of the overpayment, and does not add anything to plaintiff's right to recover. If he could recover at all, he could have brought his action the very day after he had made this overpayment."

It has also been suggested in argument that **no action** would lie in this case until demand was made, and that, as no demand could be made by plaintiff until the decision of the supreme court pronouncing against the validity of the bonds, the statute of limitations should not apply until thereafter. It is now the settled rule of law that, even as to a promissory note payable upon demand, the statute of limitations begins to run from its delivery; and this rule must apply with equal force to implied promises. *Palmer* v. *Palmer*, *supra*, 492. The court say:

"The payee could have presented it at any time, and it is not the design of the statute to put it in the power of the creditor to postpone its application at his own pleasure.  *  *  *  If a creditor has the means at all times of making his cause of action perfect, it would be unjust and oppressive to hold that he could postpone indefinitely the time for enforcing his claim by failing to present it. He is really and in fact able at any time to bring an action when he can by his own act fix the time of payment." *Vide Morrison* v. *Mullin*, 34 Pa. St. 12.

It is contended by the learned counsel for the plaintiff, with much more reason and authority, that, notwithstanding the bonds may have been illegal and non-enforceable, yet, the defendant might have recognized them as valid, and continued to pay the interest, as it did do up to the year 1872, and therefore the transaction, for the purposes of this ac-

tion, ought to be regarded as one merely voidable on the defendant's part. Be it so conceded. The statute of limitations begins to run on a voidable contract from the time it is terminated by one or other of the parties; and, when anything is done by either party indicating a purpose to end the contract, the statute of limitations begins to run from that date against an action to recover money paid thereon. *Collins* v. *Thayer*, 74 Ill. 138. This case grew out of a parol contract respecting the sale of lands, and therefore it encountered the statute of frauds. The vendee brought suit to recover back the part purchase money paid on the contract. The statute of limitations was interposed. The court said:

"The contract is not absolutely void, as are contracts that are prohibited to be made by the statute. * * * But such a contract is voidable at the will of either party, unless so far executed as to take it out of the operation of the statute. It then follows that the statute of limitations did not begin to run until one party or the other brought it to an end. If * * * Collins notified appellee that, from the time he mentioned, he and his brother would not be bound by the contract, it was then at an end, and appellee had no right further to rely upon the agreement; and the statute began at that time to run, and would bar an action to recover back the purchase money at the end of five years from that date."

The agreed statement of facts declares that defendant paid the interest on the bonds for the years 1871 and 1872, "after which the town refused to pay plaintiff any further interest, for the reason that said bonds, and the coupons thereon, were unconstitutional, and issued without any authority." That put an end to the contract. The plaintiff had no right to rely further upon its performance, "and the statute began at that time to run." Then, again, when plaintiff sued to recover on these coupons the agreed statement is that "on the 20th day of November, 1877, the town of Nevada interposed a defense in said suit by filing an answer in which it was claimed that said town was not liable in said action, for the reason that the act of March 18, 1870, under which the bonds to which said coupons had been attached was unconstitutional." This was notice placed on record by defendant that it avoided and repudiated the contract, and invoked the constitution against its enforcement. That was nearly eight years prior to the institution of this suit. After the interposition of this defense the plaintiff did not need the opinion of the supreme court, or the judgment of the circuit court, to advise him that he could not recover on the coupons, in order to make it safe to abandon the action, because, by interposing the defense of *ultra vires*, the defendant in the present action would be estopped from pleading the validity of the bonds. Clearly, it would have been an estoppel *inter partes*. In this conjuncture of affairs, no importance can be attached to the fact that the parties consented to a continuance of the suit on the coupons until after the decision of the supreme court in the *Jarrolt Case*. That did not suspend the operation of the statute of limitations. As said by the court in *Lunt* v. *Wrenn, supra:*

· "No one was lulled into a moment's inaction by the conduct of those officers in regard to the scrip. It never accomplished any purpose, either temporary

or otherwise; and no impediment lay in the way of bringing the suit from, at least, the time it is admitted appellants knew of the forgery and worthlessness of the scrip."

The plaintiff was at liberty to abandon his suit at any time after defendant interposed its answer. Mere doubt in the mind of plaintiff as to his right of recovery on the bonds would not prevent the statute of limitations from being put in motion. "There must, in order to defeat its operation, be some insuperable barrier, or some certain and well-defined exception, clearly established by judicial authority." *Weaver* v. *Leiman*, 52 Md. 709. In *Miller* v. *Adams*, 16 Mass. 456, in an action against a sheriff for an insufficient return to a writ, by reason whereof the judgment was reversed, it was held that the statute of limitations began to run from the date of the return, and not from that of the reversal of the judgment. The court very significantly observed that the plaintiff should have pursued his remedy against the officer, "at the furthest, after extending his execution; for, the judgment being then liable to reversal, he might immediately have brought his action against the officer." In *Chancellor* v. *Wiggins*, 4 B. Mon. 201, there was a sale of slaves on an implied warranty of title, who afterwards recovered their freedom. It was held that there was an immediate breach and an immediate cause of action, which was barred by the statute of limitation in five years; and it was further held that the acceptance of notice from Chancellor to Wiggins, requesting the latter to aid in defending the action of the negroes for their freedom, did not affect the case. Equally pertinent to this question is the holding in *Bishop* v. *Little*, 3 Greenl. 405. This was an action of *assumpsit* for money had and received, and grew out of the purchase by plaintiff of certain lands authorized to be sold by the legislature, to which the title wholly failed. It was held that, as no fraud was imputable to the party receiving the money, the statute of limitations was a good bar to the action, and that the cause of action accrued from the date of the receipt of the money. The court, through MELLEN, C. J., said:

"They supposed the title was good, and the legislature of Massachusetts acted under this belief. * * * All were mistaken, and not undeceived till within six years next before the commencement of this suit. It is urged by the plaintiff's counsel that, as this want of title was not discovered till within six years, the statute is no bar; that it did not commence running until the discovery was made. Such, however, is not the law. No case can be found where the statute has been avoided at law or in equity unless on the ground of fraudulent * * * concealment on the defendant's part. The case of *Bree* v. *Holbech*, 2 Doug. 654, was in all essential particulars similar to the present. The facts were that a sum of money had been paid for certain estate more than six years before the commencement of the action, and the estate sold was mortgaged property, as the defendant believed, when he sold the interest, he being an administrator. The mortgage deed was afterwards found to be a forgery; but, as the defendant had been innocent, and never concealed any facts within his knowledge relating to the title, the court held the statute of limitations to be a good bar."

It results that plaintiff's action must fail, and judgment be entered for the defendant.